**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LAURA LT WINDSOR, | ) | CASE NO. 5:18CV01534 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| ANDREW SAUL, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **MEMORANDUM OF OPINION** |
| Defendant. | ) | **AND ORDER** |
| | ) | |

Plaintiff, Laura LT Windsor ("Plaintiff" or "Windsor"), challenges the final decision of

Defendant, Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying her

applications for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB"), under

Titles II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This

Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to

28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is

AFFIRMED.

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

1

# I.   PROCEDURAL HISTORY

In June 2015, Windsor filed an application for POD and DIB alleging a disability onset date of June 11, 2014 and claiming she was disabled due to a hysterectomy, anxiety, extreme bleeding prior to her hysterectomy, joint pain, celiac disease, parotid swelling, anemia, polyarthralgia, myofascial pain, dysfunction of eustachian tube, and tenosynovitis.  (Transcript ("Tr.") at 165, 194.)  The applications were denied initially and upon reconsideration, and Windsor requested a hearing before an administrative law judge ("ALJ").  (Tr. 105, 112, 119.)

On July 11, 2017, an ALJ held a hearing, during which Windsor, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 36.)  On August 30, 2017, the ALJ issued a written decision finding Plaintiff was not disabled.  (Tr. 8-30.)  The ALJ's decision became final on May 8, 2018, when the Appeals Council declined further review.  (Tr. 1.)

On July 6, 2018, Windsor filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 20, 21, 22.)  Windsor asserts the following assignments of error:

   (1)   Whether the ALJ's analysis of treating physician Dr. Factor's medical opinion violated the treating physician rule.

   (2)   Whether the ALJ's RFC finding is supported by substantial evidence.

(Doc. No. 20.)

# II.   EVIDENCE

## A.   Personal and Vocational Evidence

Windsor was born in October 1976 and was forty years-old at the time of her administrative hearing, making her a "younger" person under social security regulations.  (Tr.

22.) *See* 20 C.F.R. §§ 404.1563.  She has a high school education and is able to communicate in English.  (*Id.*)  She has past relevant work as a cook and electronics assembler.  (*Id.*)

**B.  Relevant Medical Evidence[2]**

**1.  Mental Impairments**

On July 23, 2015, Windsor underwent a psychiatric evaluation with psychiatrist Thomas M. Robb, M.D.  (Tr. 477.)  She reported anxiety, excessive worry, and insomnia.  (*Id.*)  Dr. Robb diagnosed her with generalized anxiety disorder.  (Tr. 478.)  He prescribed Gabapentin and Klonopin and referred Windsor for psychotherapy.  (*Id.*)

Windsor underwent a diagnostic assessment with counselor Diane Maytas, LPCC, on July 28, 2015.  (Tr. 525.)  She indicated she was struggling with anxiety, worry, low motivation, and exhaustion.  (*Id.*)  She also described paranoia surrounding eating gluten.  (*Id.*)  On examination, Windsor appeared disheveled, had a flat and depressed affect, displayed a flight of ideas, with normal thought content, and no suicidal ideation.  (Tr. 528.)  She was oriented to person, place, and time, and her long term memory was intact.  (*Id.*)  Ms. Maytas noted Windsor's concentration was impaired and her judgment and insight were fair.  (Tr. 528, 529.)

Windsor subsequently began to see Ms. Maytas on a weekly basis for counseling.  (Tr. 523, 522, 521.)  She reported "keeping herself busy," by watching friend's pets, kayaking, bowling, and bike riding.  (Tr. 523, 522.)  She described being exhausted after performing small tasks.  (Tr. 521.)  Windsor displayed anxiety on examination.  (Tr. 522.)

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

Windsor returned to Dr. Robb on August 21, 2015, reporting mild depression and anxiety. (Tr. 485.) On examination, she had adequate judgment, insight, memory, and concentration. (Tr. 486.) She displayed no signs of depression or suicidal ideation. (*Id.*)

Windsor continued to visit Ms. Maytas on a weekly basis in August and September 2015. (Tr. 519, 517.) She displayed some anxiety, but also reported she was staying active by riding her bike, planning for a vacation, and playing cards with friends. (Tr. 519, 518, 569.) On September 9, 2015, she reported short term memory deficits, but her concentration was adequate on examination. (Tr. 649.) On September 15, 2015, she relayed a recent vacation was "awesome" and she was able to relax and enjoy herself. (Tr. 517.) On September 22, 2015, she described several "bad days" the prior week, during which she felt overwhelmed and anxious. (Tr. 516.)

On October 6, 2015, Windsor reported to Ms. Maytas she recently attended a concert with her sister and husband. (Tr. 568.) She reported her anxiety had improved, but described some short term memory issues. (*Id.*)

On October 7, 2015, Ms. Maytas filled out a "Daily Activities Questionnaire" on behalf of Windsor. (Tr. 532-533.) She noted the following:

- Windsor has good relationships with family and friends and regularly socializes;

- She displayed difficulty with short term memory recall;

- She has anxiety symptoms in the morning;

- Her finds her dietary needs draining, overwhelming, and challenging at times;

- She requires additional rest throughout the day;

4

- She tires easily and becomes overwhelmed with housework;

- She plans shopping throughout the week in order to avoid feeling overwhelmed;

- She takes public transportation to and from appointments; and

- Her husband and sister assist her when needed.

(*Id*.)

Windsor's October and November 2015 therapy notes from Ms. Maytas indicated she continued to stay busy by socializing and going for walks. (Tr. 567, 564, 562.) She expressed worry over Dr. Robb possibly discontinuing her medications because she felt they were working well. (Tr. 566, 562.)

In December 2015, Windsor continued to feel anxious in the morning, had short term memory issues, and often felt exhausted and overwhelmed. (Tr. 558, 559, 557, 556.) She indicated she was providing a great deal of assistance to her sister and other individuals in her life, which frustrated her. (Tr. 557.)

Windsor continued to regularly attend counseling sessions Ms. Maytas in 2016. On January 14, 2016, Windsor reported she was often worried and her hair was falling out. (Tr. 555.) Windsor appeared tired on examination. (*Id*.) On February 3, 2016, Windsor reported she recently went to Detroit for a trip and attended a concert. (Tr. 624.) She described low motivation and excessive sleep. (*Id*.) On February 19, 2016, she described anxiety and difficulty waking in the morning. (Tr. 623.) However, by March 23, 2016, Windsor indicated her mood and fatigue improved a decrease to her Gabapentin dosage and discontinuing her acid reflux medication. (Tr. 621.) She also reported her morning anxiety had improved. (*Id*.)

In April 2016, Windsor continued to express frustration and stress over providing so much support to the people in her life. (Tr. 619.) Ms. Maytas noted Windsor had trouble setting boundaries with her family. (*Id.*) In May 2016, Windsor attended a gluten free convention in Chicago with her husband. (Tr. 643, 642.) At that time, Ms. Maytas observed Windsor had "come to the realization that when she gets out of the home and does something she feels fine." (Tr. 642.)

On June 24, 2016, Windsor returned to Dr. Robb for medication management. (Tr. 647.) Dr. Robb noted Windsor continued to have anxiety, but it was managed by medication. (*Id.*) Windsor denied suicidal ideation and displayed adequate concentration in conversation. (*Id.*)

On July 21, 2016, Windsor reported to Ms. Maytas that she did not feel "too bad" and her motivation had increased. (Tr. 638.) On August 4, 2016, Ms. Maytas observed Windsor appeared "to be doing well and progressing when utilizing coping skills." (Tr. 637.)

On August 18, 2016, Windsor underwent an updated diagnostic assessment and treatment plan with Ms. Maytas. (Tr. 634.) Ms. Maytas concluded Windsor had made good progress with episodic setbacks. (*Id.*) Windsor reported she was struggling with short term memory retrieval, reading, and concentration. (Tr. 635.) She described low motivation in the morning due to her lack of employment. (Tr. 636.)

Windsor then began to see Ms. Maytas every few weeks rather than on a weekly basis. (Tr. 661, 660.) On September 1, 2016, Windsor reported she had gone on a weekend camping trip with her husband and had been walking a great deal in the evenings. (Tr. 661.) She again described low motivation. (*Id.*) On September 15, 2016, Windsor reported increased anxiety and low motivation. (Tr. 660.) On September 28, 2016, Windsor indicated that since

discontinuing her Gapapentin, she felt more aware and was able to multi-task. (Tr. 659.) However, Windsor's anxiety levels increased in October 2016. (Tr. 658.) Her memory had improved. (*Id.*)

In November 2016, Ms. Maytas observed Windsor was learning coping skills. (Tr. 739.) Windsor reported feeling exhausted by household chores. (Tr. 738.) Windsor continued to express frustration and stress with her family in December 2016. (Tr. 737, 736.)

On December 9, 2016, Windsor followed up with Dr. Robb, reporting continued anxiety. (Tr. 680.) She indicated she was able think clearer after discontinuing her Gabapentin and her stomach felt better as well. (*Id.*) On examination, she had adequate concentration and displayed anxiety. (*Id.*)

Windsor continued to treat with Ms. Maytas and Dr. Robb in 2017. On January 3, 2017, Windsor indicated she had gone out of town for New Years and enjoyed herself. (Tr. 735.) She relayed that while she was doing well, it took a lot of effort. (*Id.*) She expressed a desire to possibly work in a gluten free restaurant. (*Id.*) On January 17, 2017, Ms. Maytas noted Windsor had shown progress in "expanding her comfort zone." (Tr. 734.) Windsor denied any issues with her memory on January 31, 2017. (Tr. 733.)

In February 2017, Windsor was planning a trip to Florida. (Tr. 731.) She continued to struggle with motivation, but demonstrated progress in setting boundaries with her family members. (Tr. 731, 732.)

Windsor returned to Dr. Robb on March 10, 2017, displaying good insight, adequate judgment**,** adequate concentration in conversation, and no suicidal ideation. (Tr. 789.) On March 14, 2017, Windsor described exhaustion after completing household tasks, but had made

progress in reaching out to others for support and talking with friends. (Tr. 730.) On March 28, 2017, Windsor indicated to Ms. Maytas she struggled to pay attention and could not handle stress. (Tr. 842.)

In April 2017, Windsor reported frustration with her celiac disease. (Tr. 841, 839.) In May 2017, Windsor's sleep was improved, but she still felt exhausted most of the time. (Tr. 838, 837.) On June 20, 2017, Windsor reported she had recently attended a concert and was planning a trip with her husband. (Tr. 835.) She relayed her anxiety increased when she felt overwhelmed and had a lot of events to attend. (*Id.*)

### 2. Physical Impairments

On May 27, 2014, Windsor visited her gynecologist, Soghra Hornafar, M.D., for a surgical consultation. (Tr. 380.) She reported heavy bleeding and requested a hysterectomy. (*Id.*) Windsor underwent a hysterectomy on June 11, 2014. (Tr. 419.)

On January 8, 2015, Windsor visited primary care physician Virginia Mateo Factor, D.O., for a new patient visit. (Tr. 361.) She reported anxiety, menopausal symptoms, and joint pain and stiffness. (Tr. 361-362.) On examination, Windsor had a full range of motion in her elbows, crepitus in her right elbow, no obvious swelling in her joints, and a normal gait and station. (Tr. 364.) Dr. Factor diagnosed generalized anxiety disorder and polyarthralgia, and referred Windsor to a rheumatologist. (Tr. 365.)

Windsor initially visited rheumatologist Inderprit Singh, M.D., on February 16, 2015. (Tr. 262.) She reported pain in her left shoulder, wrists, hands, left ankle, and left foot. (*Id.*) On examination, she displayed skin hyperextensibility and ankle joint hypermobility. (Tr. 265.) The remainder of her musculoskeletal examination was normal, with no swelling and a normal

range of motion in her shoulders, elbows, wrists, hands, hips, knees, and ankles. (Tr. 265, 266.) Her gait and station were normal, with full strength and no muscle atrophy. (Tr. 267.) Dr. Singh ordered blood work. (Tr. 269.)

On February 24, 2015, gastroenterologist Mehrdad Asgeri, M.D., reviewed this labwork and diagnosed Windsor with celiac disease. (Tr. 307.) Windsor reported fatigue and anemia since her hysterectomy. (Tr. 305.)

Windsor followed up with Dr. Factor on March 2, 2015, reporting her anxiety medications were effective. (Tr. 366.) On examination, she had edema in her lower extremities, but a normal gait and station and normal mood and affect. (Tr. 369.) Dr. Factor noted a "significant improvement" in Windsor's anxiety. (*Id.*)

On March 19, 2015, Windsor underwent an EGD and had biopsies taken. (Tr. 303.) She followed up with Dr. Asgeri on March 23, 2015. (Tr. 289.) She reported mild abdominal bloating and pain, but indicated she felt "a little better" since starting a gluten-free diet. (*Id.*) Dr. Asgeri referred her to a dietician. (Tr. 291.)

Windsor visited dietician Margaret Zeller, R.D., on March 31, 2015 for a nutrition consultation. (Tr. 354.) She reported abdominal pain, bloating, and gas. (*Id.*) Ms. Zeller observed Windsor had already made dietary changes and provided her with nutrition education. (Tr. 355.)

Windsor returned to Dr. Factor on June 1, 2015, again reporting her anxiety medications were working "very well." (Tr. 370.) She saw Dr. Singh that same date, reporting her recent diagnosis of celiac disease. (Tr. 269.) Windsor indicated she was a "lot better" on her gluten free diet. (Tr. 270.) On examination, her shoulders, elbows, hips, knees, and ankles were

normal, with no swelling and a normal range of motion. (Tr. 272, 273.) Dr. Singh did observe De Quervain's tenosynovitis on the right side, but Windsor's gait and station were normal. (Tr. 274.)

On June 17, 2015, Windsor visited Dr. Singh, again reporting improvement on her gluten free diet. (Tr. 277.) She reported no side effects from her Gabapentin, other than drowsiness. (*Id*.) She rated her pain as 2/10, but 5/10 after activity. (*Id*.) On examination, her shoulders, elbows, hips, knees, ankles, and feet displayed no swelling and a full range of motion. (Tr. 280.) She had a normal gait and station, but displayed muscle weakness. (Tr. 281.)

Windsor reported continuous pain to Dr. Singh on November 30, 2015. (Tr. 539.) On examination, her shoulders, elbows, wrists, hands, hips, knees, ankles, feet, and spine all had a normal range of motion. (Tr. 542, 543.) She indicated her condition had improved on Gabapentin, but she could not increase the dosage due to dizziness. (Tr. 545.)

On December 1, 2015, Windsor visited Dr. Factor, reporting her psychiatrist wanted her to decrease her anxiety medication, but she was reluctant to do so because it was working well. (Tr. 548.) She also reported left leg pain, which began when she went on vacation to Quebec. (Tr. 549.) She relayed she was attending physical therapy for this issue, but also wanted pain medication. (*Id*.) On examination, her gait and station, as well as her mood and affect, were normal. (Tr. 551.) Dr. Factor prescribed Windsor Tramadol for her leg pain. (Tr. 552.)

On January 26, 2016, Windsor saw gastroenterologist Manzoor Qadir, M.D., for gas and bloating. (Tr. 765.) She indicated that despite eliminating gluten products from her diet, she did not feel any better. (*Id*.) A February 16, 2016 EGD revealed (1) short segment Barrett's esophagus; (2) hiatal hernia; and (3) celiac disease. (Tr. 760.) By March 7, 2016, Windsor

reported to Dr. Qadir that her gas and bloating had improved. (Tr. 762.) Dr. Qadir recommended a repeat EGD in two years. (Tr. 764.)

On March 1, 2016, Windsor visited Dr. Factor for anxiety and left leg pain. (Tr. 594.) On examination, she had a normal gait and station, as well as a normal mood and affect. (Tr. 598.) Dr. Factor prescribed Paxil to treat Windsor's hot flashes and anxiety and refilled Norco for her left leg pain. (Tr. 601.)

Windsor followed up with Dr. Singh on March 8, 2016, reporting left foot and right wrist pain, anxiety, and fatigue. (Tr. 571.) Her shoulders, elbows, wrists, hands, hips, knees, ankles, and feet were normal on examination, with no swelling and a normal range of motion. (Tr. 575.) Dr. Singh noted Windsor's persistent low-grade arthralgia and fatigue was not improving. (Tr. 577.)

On March 29, 2016, Windsor initially visited podiatrist Nicholas A. Campitelli, DPM, reporting a 6-month history of left foot pain. (Tr. 630.) She had a limited range of motion in her ankle and her gait favored her left heel. (Tr. 631.) Dr. Campitelli administered a Kenolog injection to the area. (Tr. 630.) Windsor followed up with Dr. Campitelli on April 19, 2016, reporting the injection was helpful, but she still had some residual pain. (Tr. 628.) Dr. Campitelli administered another injection at that time. (*Id.*)

Windsor returned to Dr. Factor on April 18, 2016, reporting she had discontinued taking Paxil due to nausea, dizziness, and diarrhea. (Tr. 588.) She described continued knee and ankle pain, but relayed her recent heel injection had helped considerably. (Tr. 589.) On examination, her gait and station were antalgic. (Tr. 592.) Dr. Factor prescribed Norco for Windsor's left leg pain. (Tr. 593.)

On July 13, 2016, Windsor reported her foot pain improved.  (Tr. 663.)  Dr. Singh observed she had a full range of motion in her spine, shoulders, elbows, fingers, hips, knees, ankles, and feet.  (Tr. 666, 667.)  Dr. Singh ordered updated labwork.  (Tr. 670.)

Windsor returned to Dr. Campitelli for continued left foot pain on July 26, 2016.  (Tr. 626.)  On examination, her gait was normal but she had pain with palpation of the left foot.  (Tr. 627.)  Dr. Campitelli prescribed a course of steroids and suggested a walker boot if the steroids were not helpful.  (Tr. 626.)

Windsor reported continued leg pain to Dr. Factor on August 29, 2016.  (Tr. 672.)  She relayed the Gabapentin was impacting her memory.  (Tr. 673.)  On examination, her gait and station were normal, as were her mood and affect.  (Tr. 675.)  Dr. Factor and Windsor discussed possibly decreasing her Gabapentin dosage to see if her memory improved.  (Tr. 676.)

On November 15, 2016, Windsor admitted to Dr. Campitelli she did not take the steroids for her foot pain.  (Tr. 778.)  She had 4/5 muscle strength, but her gait was normal and her sensation was intact.  (Tr. 779.)  Dr. Campitelli noted that while Windsor's left foot pain improved, she was now having left leg and ankle pain.  (Tr. 778.)

Windsor began a course of physical therapy for her left heel and leg pain on November 17, 2016.  (Tr. 725.)  On examination, she had a decreased ankle range of motion, decreased strength, and minor crepitus on the left side.  (Tr. 726, 727.)  She was unable to rise up off the ground on her left ankle.  (Tr. 726.)  Windsor attended 17 sessions of physical therapy and was discharged to a home exercise program on January 6, 2017.  (Tr. 683, 686.)  Upon discharge, she no longer complained of tenderness with palpation and she was able to complete her exercises

correctly with no complaints of pain. (Tr. 685.) Her physical therapist concluded Windsor had made "excellent progression," but still had sensitivity to deep pressure. (*Id*.)

On December 28, 2016, Windsor told Dr. Factor her podiatrist prescribed a walking boot for her left foot. (Tr. 742.) She indicated physical therapy had greatly improved her symptoms. (*Id*.) On examination, she had a normal gait and station. (Tr. 744.) Dr. Factor prescribed Norco. (Tr. 745.)

Windsor returned to Dr. Campitelli on February 7, 2017 reporting she did not find her home therapy exercises helpful. (Tr. 774.) On examination, her gait favored her left foot, but she had no specific area of pain with palpation of the left leg and her range of motion did not elicit any pain. (Tr. 775.) Windsor saw Dr. Campitelli again on February 28, 2017, and Dr. Campitelli administered a nerve block. (Tr. 772.) On examination, her vibration sensation was diminished in the lateral aspect of her left foot and her gait favored her left leg. (Tr. 773.) Dr. Campitelli noted recent EMG and nerve conduction studies demonstrated "latency [bilaterally] which is worse on the right but present on the left." (*Id*.)

On March 6, 2017, Windsor visited Dr. Qadir and denied any issues with acid reflux or heartburn. (Tr. 748.) She described nausea once a week. (*Id*.) Dr. Qadir advised her to remain on a gluten free diet. (Tr. 750.)

Windsor received another left foot Kenalog injection from Dr. Campitelli on March 7, 2017. (Tr. 770.) On examination, Windsor displayed a mild Tinel's sign with percussion of the tibial nerve. (Tr. 771.) She had severe pain with deep palpitation of the subtalar joint. (*Id*.) During her physical examination with Dr. Singh on March 31, 2017, her musculoskeletal examination was normal, beyond some left ankle and foot pain. (Tr. 815.)

An April 3, 2017 MRI of the left ankle revealed the following (1) normal sinus tarsi; (2) intact posterior tibial tendon; (3) no high grade tear or tenosynovitis; (4) mild to moderate chronic plantar fasciitis; (5) a small plantar heel spur; (6) an intact Achilles tendon; (7) normal heel musculature and tarsal tunnel; (8) scarring of the deltoid ligament; and (9) the remaining ligaments of the ankle are intact.  (Tr. 825.)

Windsor returned to Dr. Factor on April 10, 2017, reporting left leg pain.  (Tr. 828.)  Dr. Factor noted her recent EMG confirmed mild bilateral peripheral neuropathy and that Windsor's Norco was helpful with controlling her pain.  (Tr. 828.)  On examination, Windsor had a normal gait and station and a normal mood and affect.  (Tr. 831.)  Dr. Factor told Windsor to consider taking a low dosage of Lyrica for neuropathy and prescribed Norco for pain.  (Tr. 832.)

On April 11, 2017, Dr. Factor filled out a form captioned "Physical Medical Source Statement" on behalf of Windsor.  (Tr. 805-808.)  Dr. Factor found the following limitations for Windsor:

- She can walk four city blocks without rest or severe pain;

- She can sit for 20-30 minutes at one time;

- She can stand for 20-30 minutes at one time;

- She can sit, stand, and walk for less than 2 hours total in an 8-hour workday;

- She requires a job that permits shifting positions at will from sitting, standing, and walking;

- She needs requires 5-minute periods of walking every 30 minutes;

- She must take at least one break every 2 hours, for 10-20 minutes at a time;

14

- She must keep her legs elevated at a 90 degree angle for 50% of the workday if she has a sedentary job;

- She does not require a hand-held assistive device;

- She can frequently lift less than 10 pounds, occasionally lift 10 pounds, and rarely lift 20 pounds;

- She can rarely twist, stoop, and climb stairs;

- She can never crouch, squat, or climb ladders;

- She can only use her hands and fingers for 10% of the workday for grasping objects and fine manipulation;

- She can reach her arms in front and over the body for 25% of the workday;

- She will likely be off-task for 20% of the workday;

- She is incapable of even "low stress" work due to moderate to severe anxiety;

- She will have "good days" and "bad days;" and

- She will miss work more than four days per month.

(Tr. 806-808.)

On April 12, 2017, Windsor visited Dr. Campitelli, indicating her last foot injection was not helpful  (Tr. 800.)  On examination, her gait was antalgic and favoring the left leg.  (Tr. 801.)

Windsor returned to Dr. Singh on April 26, 2017, reporting pain in her neck, right wrist, left hip, and knees, along with intermittent dizziness and tingling feet.  (Tr. 810.)  Windsor's musculoskeletal examination was overall normal, beyond pain with palpation to her left ankle and foot.  (Tr. 811.)  Her tender point examination was unremarkable, with pain only on deep palpitation.  (*Id*.)

### C. State Agency Reports

#### 1. Mental Impairments

On August 18, 2015, state agency psychologist Paul Tangeman, Ph.D., reviewed

Windsor's medical records and completed a Psychiatric Review Technique ("PRT"). (Tr. 83-

84.) He concluded Windsor had (1) mild restrictions in activities of daily living; (2) moderate

difficulties in maintaining social functioning; (3) moderate difficulties in maintaining

concentration, persistence, and pace; and (4) no episodes of decompensation. (Tr. 84.) Dr.

Tangeman also completed a Mental Residual Functional Capacity ("RFC") Assessment. (Tr. 85-

86.) He concluded Windsor was moderately limited in her abilities to (1) maintain attention and

concentration for extended periods; (2) complete a normal workday and workweek without

interruptions from psychologically based symptoms and to perform at a consistent pace without

an unreasonable number and length of rest periods; and (3) interact appropriately with the

general public. (*Id*.) Dr. Tangeman explained the basis of his conclusion as follows:

> [Claimant] can work in a setting which is not fast paced and does not require
> strict quotas.
>
> ***
>
> [Claimant] could interact with others at least superficially. May have
> problems with extensive contact with the general public.

(Tr. 86.)

On December 19, 2015, state agency psychologist Marjorie Kukor, Ph.D., reviewed

Windsor's medical records and completed a PRT and Mental RFC Assessment. (Tr. 98-99; 100-

101.) She adopted the findings of Dr. Tangeman. (*Id*.) Dr. Kukor explained the basis of her

conclusion as follows:

[Claimant's symptoms] can impact concentration and persistence. When [symptoms] severe, [claimant] will need occasional flexibility in scheduling work and break times, and relaxed pace/quota requirements.

\*\*\*

[Claimant's symptoms] can impact social interactions. [Claimant] can have occasional, superficial contact with the general public that does not require her to address customer complaints or resolve customer problems. [Claimant] works best with small number of co-workers/supervisors, or by self.

(Tr. 101.)

### 2. Physical Impairments

On July 24, 2015, state agency physician Dimitri Teague, M.D., reviewed Windsor's medical records and concluded she did not have a severe physical impairment. (Tr. 83.) On December 12, 2015, state agency physician Gary Hinzman, M.D., also reviewed Windsor's medical records and reached the same conclusion. (Tr. 98.)

## D. Hearing Testimony

During the July 2017 hearing, Windsor testified to the following:

- Her weight has been fluctuating since 2014. (Tr. 43.) She has unintentionally lost about 30 pounds, which she attributes to her celiac disease. (*Id.*) Her doctors have not indicated she is underweight, but they are "keeping an eye on it." (*Id.*)

- She drives and does not have a handicap placard. (Tr. 44.) She completed high school. (*Id.*) She previously worked as a line cook at several different restaurants. (Tr. 45, 47, 50.) She also worked as an electronics assembler in a factory. (Tr. 49.)

- She underwent a hysterectomy in June 2014. (Tr. 51.) Several weeks after this procedure, she noticed her muscles and joints were stiff and sore. (*Id.*) She underwent some bloodwork shortly thereafter and it was discovered she had celiac disease. (Tr. 51-52.)

- She also developed high levels of anxiety following her hysterectomy. (Tr. 52.) She takes medications, but still has anxiety. (Tr. 54-55.) She has "brain fog," which she attributes to menopause and celiac. (Tr. 55.) She used to be an "extremely social person," but now limits her social interactions and finds them exhausting. (Tr. 57-58.)

- She has pain in her left foot and neuropathy in her legs. (Tr. 52.) An MRI and EMG confirmed nerve damage in both of her legs. (Tr. 53.) She also has tendon damage in her left leg and foot. (*Id.*) Her doctors have told her there is no surgical fix for this issue. (*Id.*) Her neuropathy impacts her balance. (Tr. 62.)

- Her energy level is low, and 2-3 days a week she does not have energy to do anything at all. (Tr. 59.)

The VE testified Windsor had past work as a cook and electronics assembler. (Tr. 66-67.) The ALJ then posed the following hypothetical question:

> Okay. All right, and my second hypothetical the individual could occasionally lift and/or carry, including upward pulling of 10 pounds; frequently lift and/or carry, including upward pulling of less than 10 pounds; stand and/or walk with normal breaks for a total of about two hours in an eight-hour workday; sit with normal breaks for about six hours in an eight-hour workday; pushing and pulling, I'm going to limit the left lower extremity to occasional foot controls. Otherwise, I have no limits in pushing and pulling other than what was indicated for lifting and carrying. This individual could occasionally climb ramps and stairs; occasionally balance, stoop, knee, crouch, crawl; never climb ladders, ropes and scaffolds; would still want to avoid hazardous machinery and unprotected heights; frequent handling and fingering bilaterally and, okay, so all of the mental health limitations I gave you are going to remain the same[3] except I'm going to add

---

[3]     The mental limitations from the prior hypothetical are as follows: "I do have the following additional limitations, no tasks that involve high production quotas or fast-paced production demands such as assembly line production, but the individual is able to perform goal-oriented work such as office cleaning; occasional and superficial interaction with co-workers and the public with superficial defined as or meaning no tasks involving confrontation, conflict or where she would be directing the work of others, persuading or influencing others or being responsible for the safety or welfare of others. There should be only occasional changes in workplace tasks or duties with any such changes being gradually introduced and needs those explained." (Tr. 68.)

limited to repetitive tasks that can be learned in 30 days or less. There's still no fast pace, occasional superficial and occasional changes in workplace tasks or duties.

(Tr. 69-70.)

The VE testified the hypothetical individual would not be able to perform Windsor's past work. (Tr. 70.) The VE further explained the hypothetical individual would be able to perform other representative jobs in the economy, such as an addresser (D.O.T.#209.587-010); a document preparer (D.O.T. #249.587-018); and a touch-up screener (D.O.T. #726.684-110). (*Id*.)

## III.   STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Windsor was insured on her alleged disability onset date, June 11, 2014 and remained insured through September 30, 2018, her date last insured ("DLI.") (Tr. 13-14.) Therefore, in order to be entitled to POD and DIB, Windsor must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve

month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through September 30, 2018 (Exhibit 6D).

2.    The claimant has not engaged in substantial gainful activity since June 11, 2014, the alleged onset date (20 CFR 404.1571 *et seq.*)(Hearing Testimony, and Exhibits 2D-9D, 3E, and 9E).

3.    The claimant has the following severe impairments: Celiac disease and celiac arthropathy/undifferentiated spondyloarthritis from celiac disease; peripheral neuropathy; benign hypermobility syndrome; obesity; vertigo; upper and lower extremity problems that include equinus contracture ankle/nerve entrapment of the left lower limb, tarsal tunnel syndrome/tendinitis of the left foot/plantar fasciitis, peroneal tendinitis of the left leg, Dequervain's disease (tenosynovitis), and polyarthralgia/myofascial pain; depression; and anxiety/generalized anxiety disorder (20 CFR 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except can occasionally lift and/or carry (including upward pulling) 10 pounds frequently lift and/or carry (including upward pulling) less than 10 pounds; stand and/or walk (with normal breaks) for a total of about 2 hours in an 8-hour workday; sit (with normal breaks) for a total of about 6 hours in an 8-hour workday; push and/or pull ability (including operation of hand/foot controls) is limited in regards to the left lower extremity to occasional foot controls, otherwise unlimited pushing and pulling other than as indicated for lifting and/or carrying; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, or crawl; never climb ladders, ropes, or scaffolds; must avoid hazardous machinery and unprotected heights; frequent handling and fingering bilaterally; no tasks that involve high production quotas or fast-paced production demands, such as assembly line production, but can perform goal-oriented work such as office cleaning;

occasional and superficial interaction with coworkers and the public (with "superficial" meaning no tasks involving confrontation, conflict resolution, directing the work of others, persuading or influencing others, or being responsible for the safety or welfare of others); only occasional changes in workplace tasks or duties with any such changes being gradually introduced and easily explained; and limited to repetitive tasks that can be learned in 30 days or less.

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565)(Hearing Testimony, and Exhibits 2D-9D, 3E, 9E, 12E, and 13E).

7.   The claimant was born on October **, 1976 and was 37 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563).

8.   The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from June 11, 2014, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 13-23.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to

proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);

*White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been

defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v.*

*Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and*

*Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are

supported by substantial evidence, the Court does not review the evidence *de novo*, make

credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*,

889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston*

*v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner

are not subject to reversal, however, merely because there exists in the record substantial

evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir.

2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of*

*Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another

conclusion, the decision of the Administrative Law Judge must stand if the evidence could

reasonably support the conclusion reached.")  This is so because there is a "zone of choice"

within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d

at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by

substantial evidence, the Court must determine whether proper legal standards were applied.

Failure of the Commissioner to apply the correct legal standards as promulgated by the

regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### A.        Treating Source Opinion – Dr. Factor

In her first assignment of error, Windsor argues the ALJ failed to provide good reasons for assigning Dr. Factor's opinion regarding absenteeism "partial weight."  (Doc. No. 20 at 20.) She asserts this cannot constitute harmless error because the "VE testified that there would be no competitive employment available for an individual who would be absent from the workplace more than one day per month."  (*Id.*)  Windsor contends the ALJ's conclusion this particular limitation was an "unsubstantiated limitation" is at odds with the medical evidence, because the

record indicates she "required treatment for her multitude of health problems more than one day per month." (*Id.* at 22.)

The Commissioner maintains the ALJ properly considered the opinion of Dr. Factor. (Doc. No. 21 at 4.) The Commissioner asserts the ALJ provided "multiple good reasons" for assigning Dr. Factor's opinion partial weight. (*Id.* at 5.) The Commissioner argues these reasons are "grounded in the regulatory factors of supportability and consistency in reducing the weight given to Dr. Factor's opinion, and thus, the ALJ's weighing of that opinion should be upheld." (*Id.* at 7-8.)

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).[4] However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009). Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[5] *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source

---

[4]   Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date. *See* 82 Fed. Reg. 5844 (March 27, 2017).

[5]   Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment

opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.*, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id.* § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007). *See also Gayheart*, 710 F.3d at 376. The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence,

---

relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486

F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical

data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler,* 756 F.2d

431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley,* 581

F.3d at 406.  Moreover, the "treating physician rule" only applies to *medical opinions*.  "If the

treating physician instead submits an opinion on an issue reserved to the Commissioner—such

as whether the claimant is disabled, unable to work, the claimant's RFC, or the application of

vocational factors— [the ALJ] decision need only 'explain the consideration given to the

treating source's opinion.'" *Johnson v. Comm'r of Soc. Sec*., 535 Fed. App'x 498, 505 (6th Cir.

2013).  The opinion, however, "is not entitled to any particular weight." *Turner*, 381 Fed.

App'x at 493.  *See also Curler v. Comm'r of Soc. Sec.,* 561 Fed. App'x 464, 471 (6th Cir.

2014).

The ALJ weighed the opinion of Dr. Factor as follows:

The undersigned assigns partial weight to the treating physician's opinion,
as it does not merit controlling weight (Virginia M. Factor, D.O., 4/11/17,
Exhibit 36F).  She is an acceptable medical source and a long-time treating
source.  However, she opined that the claimant cannot even perform
sedentary work (cannot sit for 2 hours in an 8-hour workday) and would be
absent from work more than four days per month, which are
unsubstantiated limitations.  For instance, she opined a very severely
limiting residual functional capacity, yet did not list the diagnoses that she
considered in this assessment.  Also, the physical examination that she
performed on April 10, 2017 provides no basis for her opinion, as the
examination yielded normal results.  Furthermore, the documentation in the
record shows that the claimant is treated by other providers, such as a
podiatrist for her foot pain and a rheumatologist for her celiac disease,
which is even acknowledged by her in her office visit notes (Exhibit 39F),
but there is no evidence that these other providers have sent reports to this
physician, which could have been helpful to her in preparing an opinion.

(Tr. 21.)

The Court finds the ALJ did not err is assigning less than controlling weight to Dr. Factor's opinion. In assigning "partial weight" to Dr. Factor's conclusions, the ALJ addressed consistency of the opinion with the record, noting the opinion conflicted with Dr. Factor's own treatment notes which yielded normal findings. The ALJ also considered the supportability of the opinion, noting Dr. Factor did not provide what diagnoses supported this restrictive opinion. Finally, the ALJ observed there was no indication Windsor's other providers had provided reports to Dr. Factor when she was preparing her opinion. (*Id.*)

Windsor contends the ALJ's "statement that Dr. Factor's absenteeism limitation is 'unsubstantiated' . . . is unsupported by the record." (Doc. No. 20 at 22.) In support of this argument, Windsor asserts she requires "treatment for her multitude of health problems more than one day per month." (*Id.*) Windsor misunderstood the ALJ's reasoning. The ALJ discounted Dr. Factor's absenteeism limitation because it was "unsubstantiated," noting Dr. Factor did not "list the diagnoses considered in this assessment." (Tr. 21.) Contrary to Windsor's argument, the ALJ was not rejecting this portion of Dr. Factor's opinion because there was no objective evidence to support it, but because the doctor herself provided no support for this conclusion. (Tr. 808.)

In addition, Windsor's suggestion that because she has multiple medical appointments she would be excessively absent from work is dubious. Windsor points to no evidence that she would be unable to schedule her various doctors' appointments around work shifts or a work schedule. Indeed, there is no indication she needs to be in treatment or visiting with her medical providers during specific hours, such as in the case of patients undergoing dialysis or intensive

outpatient mental health treatment. The fact she currently chooses to visit her physicians during regular working hours does not automatically preclude her from all work.

Moreover, substantial evidence supports the ALJ's finding Dr. Factor's opinion was entitled to partial weight. Windsor has consistently reported stiffness and joint pain to her rheumatologist, Dr. Singh. (Tr. 361, 262, 539.) However, Dr. Singh has repeatedly noted a normal range of motion and no swelling in her spine, shoulders, elbows, wrists, hands, hips, knees, and ankles. (Tr. 266, 272, 273, 280, 242, 243, 666, 667, 811.) Windsor often has a normal gait and station, despite her allegations of disabling foot and leg pain and neuropathy. (Tr. 267, 369, 281, 551, 598, 627, 778.) Moreover, Windsor participates in physical exercise on a consistent basis, despite her allegations. Indeed, Windsor has reported biking to her counseling appointments, walking for exercise, kayaking, bowling, and participating in yoga. (Tr. 525, 523, 522, 519, 562, 638, 661, 659, 734, 733.)

Accordingly, the Court finds the ALJ met the burden of offering good reasons to support her decision to assign less than controlling weight to Dr. Factor's opinion. Windsor's first assignment of error, therefore, is without merit and does not provide a basis for remand.

**B.** **State Agency Opinion**

In her second assignment of error, Windsor asserts the RFC is not supported by substantial evidence because "the ALJ inadequately considered the State agency psychological opinions of record regarding [her] mental functioning." (Doc. No. 20 at 22.) Windsor argues that despite assigning "partial weight" to the opinion of state agency physician Dr. Kukor, the ALJ "excluded the need for occasional flexibility in scheduling from the RFC finding without

explanation." (*Id.* at 23.) Windsor asserts Dr. Kukor's opinion "contradicts the RFC finding and the ALJ has failed to explain this contradiction." (*Id.*)

The Commissioner maintains the "ALJ was under no obligation to accept every limitation opined by Dr. Kukor." (Doc. No. 21 at 8.) The Commissioner asserts "there is no legal basis for arguing that affording Dr. Kukor's opinion partial weight means that the ALJ had to then accept all limitations opined by the doctor." (*Id.* at 9.)

In formulating the RFC, ALJs "are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists." 20 C.F.R.§ 404.1527(e)(2)(i)[6]. Nonetheless, because "State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists," ALJs must consider their findings and opinions. *Id.* When doing so, an ALJ "will evaluate the findings using the relevant factors[7] in paragraphs (a) through (d) of this section, such as the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions." 20 C.F.R. § 404.1527(e)(2)(ii). Finally, an ALJ "must explain in the decision the weight given to the

---

[6]     Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date. *See* 82 Fed. Reg. 5844 (March 27, 2017).

[7]     These factors include the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision. 20 CFR §416.1527(c)(1)-(6).

opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist" unless a treating physician's opinion has been accorded controlling weight. *Id.*

As noted *supra,* state agency psychologist Dr. Kukor opined Windsor, among other things, would require **"**occasional flexibility in scheduling work and break times." (Tr. 101.) The ALJ did not include this restriction in the RFC, instead limiting Windsor to no high production quotas or fast-paced production demands, and only "occasional changes in work place tasks or duties with any such changes being gradually introduced and easily explained." (Tr. 17.) In the decision, the ALJ weighed Dr. Kukor's opinion as follows:

> The undersigned assigns partial weight to the State Agency psychological consultants' opinions (Paul Tangeman, Ph.D., 8/18/2015, Exhibit 2A, and Marjorie Kukor, Ph.D. 12/19/15, Exhibit 4A). They have specialized knowledge in evaluating mental impairments and the listing under the SSA standards of disability. However, when they provided their opinions, they partly based their opinions on evaluating the case under the prior Part B Criteria. Also, they were able to review only about one-third of the mental health evidence, and based upon the limited evidence in the record when they provided their opinions in 2015, they opined that the claimant has mild-to-moderate limitations, which is not consistent with the additional mental health evidence that is now in the record.

(Tr. 20-21.)

The Court finds the ALJ properly evaluated the opinion of Dr. Kukor. The ALJ expressly acknowledged Dr. Kukor's opinion, observing she found Windsor had mild to moderate mental health limitations. (*Id.*) The ALJ accorded "partial weight" to this opinion and provided several reasons for doing so. Specifically, the ALJ recognized the state agency physicians had "specialized knowledge in evaluating mental impairments and the listing under the SSA standards of disability." (*Id.*) The ALJ also noted Dr. Kukor's opinion was rendered

under outdated criteria, as well as "limited evidence," which was not consistent with the "additional mental health evidence that is now in the record." (Tr. 21.) Moreover, prior to weighing this opinion, the ALJ discussed, at length, Windsor's mental health treatment notes and her "very active lifestyle." (Tr. 19-20.) After this careful review, the ALJ provided several reasons as to why she was affording the state agency opinions "partial weight." (Tr. 20-21.) Procedurally, the regulations require no more.

Windsor contends because the ALJ assigned Dr. Kukor's opinion "partial weight," the ALJ was required to explain each deviation between the opinion and the RFC. (*See* Doc. No. 20 at 22-23.) The Court rejects this argument. Even when an ALJ accords "great weight" to a medical opinion, the ALJ is not required to adopt every facet of the opinion expressed by the medical source. *See Taylor v. Colvin*, 2013 WL 6162527 at *15 (N.D.Ohio Nov.22, 2013) (finding ALJ was not required to adopt every opinion of an ME "by virtue of the fact that, overall, he gave [the ME's] opinion great weight"). *See also White v. Comm'r of Soc. Sec.*, 2013 WL 4817673 at * 16 (N.D.Ohio Sept. 10, 2013) (noting that "[t]he fact that the ALJ did not incorporate all of Dr. Castor's restrictions, despite attributing significant weight to his opinion, is not legal error in and of itself"); *Smith v. Comm'r of Soc. Sec.*, 2013 WL 1150133 at * 11 (N.D. Ohio Mar. 19, 2013). Thus, although the ALJ assigned "partial weight" to Dr. Kukor's conclusions, he was not required to include all of the limitations in the RFC or "explain why [she] did not adopt all of [the] limitations." *Hedick v. Berryhill*, 2018 WL 6348759, *6 (N.D. Ohio Nov. 14, 2018), *report and recommendation adopted by* 2018 WL 6344611 (N.D. Ohio Dec. 4, 2018).

Moreover, the ALJ's RFC is supported by substantial evidence.  As noted by the ALJ, Windsor's mental health treatment notes indicate that, despite her allegations of debilitating anxiety and low stress tolerance, she has a very active lifestyle. She regularly exercises and spends time with friends.  (Tr. 525, 523, 522, 519, 569.)  She goes on multiple trips each year, including to Florida, Detroit, and Chicago.  (Tr. 517, 624, 642, 661, 731, 835.)  She attends concerts with family members on a regular basis.  (Tr. 568, 567, 624, 835.)  Moreover, she is able to provide significant support to the people in her life, in particular her sister.  (Tr. 559, 623, 643.)  Indeed, her therapist noted Windsor had trouble setting boundaries with family members and would often be frustrated with how much support she provided them.  (Tr. 557.).  While Windsor has consistently reported anxiety and low motivation throughout the relevant period, she also repeatedly indicated she found her medications effective.  (Tr. 370, 548, 647.)  During appointments with her psychiatrist, Dr. Robb, Windsor displayed adequate memory, no suicidal ideation, adequate concentration in conversation, and good insight.  (Tr. 478, 486, 649, 647, 680, 789.)  The ALJ discussed much of this evidence and observed that despite Windsor's allegations, "she generally has normal examinations and finds the motivation and strength to follow through with actions that she is interested in taking and can find enjoyment in doing, and in fact, has been living a very active lifestyle for the past few years."  (Tr. 19.)

Further, while Windsor argues the ALJ "failed to explain this contradiction" between Dr. Kukor's opinion and the RFC, she does not direct this Court's attention to what specific evidence would support this particular restriction.  (Doc. No. 20 at 23.)  Indeed, within her argument, Windsor does not cite to any medical evidence, beyond Dr. Kukor's own opinion, which would support greater mental limitations in the RFC.  (*See* Doc. No. 20 at 22-24.)  In this

case, the ALJ clearly articulated her reasons for finding Windsor capable of work as set forth in the RFC and these findings are supported by substantial evidence. Windsor's assertion the evidence of record warrants a different RFC assessment because a state agency physician opined otherwise is without merit.

Accordingly, the Court finds the ALJ properly considered the opinion of Dr. Kukor and her conclusion is supported by substantial evidence. Windsor's second assignment of error, therefore, is without merit and does not provide a basis for remand.

## VII. CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

  *s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: August 27, 2019